IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| OSVALDO FIGUEROA, | ) |
| *Plaintiff*, | ) |
| v. | ) Case No.: 5:20-cv-00585 |
| BUTTERBALL, LLC, | ) **COMPLAINT** |
| *Defendant*. | ) |

COMES NOW, Osvaldo Figueroa ("Plaintiff"), by and through undersigned counsel, complaining of the above-named Defendant Butterball, LLC ("Defendant"), alleges and avers as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff is a former employee of Defendant, who has been subject to several previous lawsuits as a result of Defendant's violative wage practices under the FLSA and state wage and hour law, including the NCWHA.

2. This action is brought for unpaid minimum wages, unpaid overtime compensation, liquidated damages, and all related penalties and damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. Plaintiff was an employee of Defendant for approximately two (2) years. During his employment, Plaintiff worked for Defendant as a catcher/loader in Defendant's turkey department. For his work as a loader/catcher, Defendant willfully failed and refused to compensate Plaintiff for all hours worked, including hours worked in excess of forty (40) in a week at a rate of time and one-half his regular rate, due and owing to Plaintiff, in direct violation of the FLSA, 29 U.S.C. § 201 *et seq*.

3. Plaintiff also brings this action against Defendant for failing to pay Plaintiff promised straight-time compensation, premium compensation, and all owed, earned, and/or promised wages, on his regular pay date, in direct contravention of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1, *et seq*.

4. Defendant's pay practices and policies were in direct violation of the FLSA and the NCWHA. Accordingly, Plaintiff seeks unpaid straight-time compensation, unpaid owed, earned, and/or promised wages, and unpaid overtime compensation, in addition to liquidated damages, attorneys' fees and costs, prejudgment interest, and other damages permitted by applicable law.

5. Plaintiff also brings this action against Defendant for discrimination and wrongful termination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et. seq*, and North Carolina Public Policy.

## **JURISDICTION AND VENUE**

6. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based upon the claims brought under the FLSA, 29 U.S.C. § 201, *et seq*., and under the ADA, 42 U.S.C. § 12101, *et. seq*.

7. Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state law claims under the NCWHA, because those state law claims arise out of the same nucleus of operative fact as the FLSA claims.

8. The United States District Court for the Eastern District of North Carolina has personal jurisdiction because Defendant's primary place of business in North Carolina is in Wake County, which is located within this District.

9. Additionally, a substantial part of the events that gave rise to this action occurred at Defendant's Warsaw turkey processing plant, located in Duplin County, North Carolina, which

is also within this District.

10. The claims for violations of the NCWHA are based upon the statutory law of the State of North Carolina.

11. Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367 for the pendent state claims because they arise out of the same nucleus of operative facts as the FLSA and ADA claims.

12. All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

13. The evidence establishing liability for both causes of action will be similar, and neither issue will predominate nor create confusion for a jury.

## **PARTIES**

14. Plaintiff is an adult resident of Clinton, North Carolina. He worked as a poultry loader/catcher for Defendant at its Warsaw, North Carolina, location from approximately May 8, 2017 until May 2019.

15. Defendant Butterball, LLC is a limited liability corporation, with its principal place of business located at One Butterball Lane, Garner, North Carolina 27529.

16. Defendant is one of the largest producers of turkey products in the United States, producing and distributing over one-billion pounds of turkey each year throughout the United States and in more than thirty (30) countries.

17. Defendant operates six (6) processing plants in North Carolina, Arkansas, and Missouri.

18. According to its website, Defendant has over 6,000 employees throughout its six plant locations and corporate offices.

## COVERAGE

19. At all times material to this action, Defendant has acted, directly or indirectly, in the interest of an employer with respect to Plaintiff.

20. At all relevant times, Defendant was an employer within the meaning of the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

21. Defendant is an employer within the meaning of the ADA, 42 U.S.C. § 12111, in that Defendant had at all times relevant to this action employed twenty (20) or more employees for every working day in each of 20 or more calendar weeks in the current or preceding calendar year.

22. At all relevant times, Defendant operated as an enterprise within the meaning of 29 U.S.C. § 203(r)(1).

23. At all relevant times, Plaintiff was an employee engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206, 207.

24. At all relevant times, Defendant has had gross operating revenues in excess of $500,000, consistent with 29 U.S.C. § 203(s)(1)(A)(ii).

## WAGE-RELATED FACTUAL ALLEGATIONS

25. Plaintiff worked for Defendant as a loader/catcher in Defendant's turkey department at Defendant's processing plant located in Warsaw, North Carolina. Plaintiff was a non-exempt employee.

26. At the beginning of each shift, Plaintiff would arrive at Defendant's office in Warsaw, North Carolina, at which point Defendant would transport Plaintiff to Defendant's farm, where the turkeys were located.

27. As a catcher/loader, Plaintiff's primary duties included separating and

catching/loading turkeys onto trucks. Plaintiff was responsible for setting up metal equipment to help guide turkeys and allow for quicker, more efficient corralling of the poultry.

28. Plaintiff did not receive specialized training to perform these duties. The nature of Plaintiff's work is unskilled, repetitive, and rote.

29. Plaintiff is not engaged in raising poultry. Rather, each shift, Plaintiff is exclusively responsible for catching and loading thousands of turkeys per day, separating living and dead turkeys as he catches/loads the poultry.

30. During each shift, Plaintiff typically loads approximately 14-16 trucks. During the busier, holiday season, Plaintiff typically loads approximately 18-20 trucks per shift.

31. Defendant scheduled Plaintiff to work from 6:30 p.m. until approximately 9:30 a.m. the next day, six days per week. Typically, Plaintiff started his week on Sunday evening and worked through Saturday morning at 9:30 a.m of the same week. On average, once per month the machines would break down and Plaintiff would work until 2:00 p.m. or 3:00 p.m., waiting for machines to be repaired.

32. During each shift, Plaintiff was permitted to take a one-hour, uninterrupted lunch break. However, Plaintiff's ability to take a lunch break depended on the general pace of the production line—once all of the trucks had been filled and the trucks had left to deposit the poultry at the production factory, Plaintiff was permitted to take a break, until the trucks returned for additional poultry loads.

33. Therefore, given Plaintiff's regularly scheduled shifts, Plaintiff typically worked approximately ninety (90) hours each week for Defendant.

34. From November to early February, Defendant required Plaintiff to work significantly more hours than his regular schedule, to meet the holiday demands. During this time

5
Case 5:20-cv-00585-D   Document 1   Filed 11/04/20   Page 5 of 19

period, Plaintiff typically worked seven days a week for Defendant and was only permitted to take one to three days off during any given holiday season. In other words, during the holiday season, Defendant required Plaintiff to work nearly ninety (90) days straight, without a day off.

35. Defendant compensates Plaintiff each week ("Pay Period") on Fridays.

36. When Plaintiff began his employment with Defendant, Defendant instructed Plaintiff he would be paid on a piece-rate basis at a rate of $12 per truck load of turkeys. However, during the initial hiring process, Plaintiff's manager, "Rocco," alongside a representative from Defendant's Human Resources ("HR") department, informed Plaintiff he would be paid overtime for hours over 40 per week.

37. Although Defendant hired Plaintiff on a piece-rate basis, Defendant treated Plaintiff like an hourly employee, requiring Plaintiff to track his daily hours worked, reporting his hourly rate on his earning statement, and when "Rocco" hired Plaintiff, he promised Plaintiff overtime compensation for hours over 40 per week.

38. Given Defendant's promises regarding overtime compensation, his hourly rate demonstrated on his earning statement, and Defendant's timekeeping requirements, Plaintiff believed he would be and should have been paid time and one-half for all hours over 40 per week. Each shift, Plaintiff was required to use Defendant's time clock, to document the time Plaintiff performed work for Defendant from the minute he arrived at Defendant's Warsaw office to the minute Plaintiff's shift ended.

39. Moreover, Plaintiff's paystubs reflect an hourly pay rate of $18.08.

40. While Plaintiff was required to regularly work hours in excess of forty (40) per week, he is not paid any overtime premiums.

41. Despite Defendant maintaining records that document all hours worked by Plaintiff

each pay period, Defendant systemically undercalculates Plaintiff's wages.

42. Similarly, taking into account all of the hours Plaintiff worked and the amounts he was paid each week, Defendant routinely pays Plaintiff less than his promised hourly rate.

43. For example, during the pay period from January 16, 2018, to January 22, 2018, Plaintiff worked approximately 90 hours. Defendant compensated Plaintiff $1,419.66. However, as documented on Plaintiff's paystub, Plaintiff's hourly rate at the time was $18.08. According to this promised hourly rate, and including a premium overtime rate of $27.12, Defendant should have compensated Plaintiff at least $2,079.20. In other words, for the work Plaintiff performed for Defendant from January 16, 2018 to January 22, 2018, Defendant owes Plaintiff at least $659.54 in unpaid wages for this one week alone.

## DISCRIMINATION AND WRONGFUL TERMINATION FACTS

44. Plaintiff suffers from severe asthma.

45. During his years of working for Defendant, Plaintiff performed his duties satisfactorily.

46. While working in the loading area, Plaintiff was regularly exposed to extreme humidity and cold as well as dirt and filth, which resulted in polluted air, filled with particles, dust, and animal dander.

47. These dusty and dirty working conditions exacerbated Plaintiff's asthmatic condition.

48. Regularly, throughout the course of catching and loading poultry onto the trucks, Plaintiff had to step away from the debris filled area to use his inhaler. Additionally, as a result of the continued exposure to extreme heat and cold as well as polluted air, Plaintiff's condition began to deteriorate, resulting in sharp pains in his lower back and daily asthma attacks.

49. On at least two (2) occasions, Plaintiff suffered such severe asthma attacks that Plaintiff felt as if he were going to die, given his inability to breathe. Yet, Defendant had grown weary of Plaintiff's asthmatic condition and treated it more as an inconvenience to Defendant. As such, on one occasion, Defendant simply drove Plaintiff from the poultry farm back to the main office in Warsaw, so Plaintiff could drive himself to the hospital, even though Plaintiff was in no condition to drive himself.

50. Due to Plaintiff's asthma becoming so severe, as a result of the particles in the air while loading turkeys, Plaintiff was unable to perform his work at the level he once had.

51. Plaintiff communicated these issues with his supervisor, Allen. Plaintiff's supervisor informed Plaintiff that Defendant would no longer accept Plaintiff's doctor's notes for missed work, and that Defendant would begin counting disciplinary points against Plaintiff for any reduced production in work.

52. Following this conversation, Defendant's human resources ("HR") representative informed Plaintiff they would find him a new position within the company if he provided a doctor's note, outlining the effects the working conditions had on Plaintiff's asthma and any work restrictions.

53. Following this conversation, Defendant provided Plaintiff a "Return to Work Authorization" form to be completed by Plaintiff's treating physician.

54. Plaintiff's treating medical provider then completed Defendant's work authorization form, specifically noting, that as a result of Plaintiff's asthma, Plaintiff should not work where the temperature falls below 45 degrees Fahrenheit and explicitly stated Plaintiff should avoid exposures to irritants, including areas where chemicals are sprayed, and that Plaintiff should not work in dusty areas or in extreme heat, cold, or humidity.

55. On or about April 17, 2019, Plaintiff provided Defendant a copy of the completed work authorization form. Upon receiving Plaintiff's doctor's note with work restrictions, Defendant's HR representative instructed Plaintiff to go home. The HR representative further instructed Plaintiff that Defendant was considering at least three other positions within Defendant's plant to accommodate Plaintiff's disability and a call to Plaintiff regarding the same would be forthcoming.

56. Specifically, Plaintiff was informed he was being considered for other, similar positions on the poultry production line, including in (1) the department where workers package slaughtered animal, (2) the Mill where workers make the food for turkeys, or (3) the department where workers build the boxes for packaging.

57. On or about May 8, 2019, rather than transfer Plaintiff to one of the similar, unskilled positions that could have accommodated Plaintiff's disability, Defendant terminated Plaintiff.

58. Despite Plaintiff's history of excellent work and following Defendant's instructions to seek accommodations, he was ridiculed and denied accommodations, and his health was placed in jeopardy due to the hostile working conditions.

59. On May 22, 2019, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), charging Defendant with unlawful disability discrimination under the ADA. Said charges were filed within 180 days of the last discriminatory actions by Defendant.

60. More than 180 days have elapsed since Plaintiff filed his charges with the EEOC. Having found reasonable cause to believe Defendant violated the ADA as alleged by Plaintiff's charging complaint, the EEOC issued Plaintiff a right to sue letter, attached hereto as Exhibit A.

61. At this time, Plaintiff has decided to institute a private lawsuit, and is filing the same within ninety (90) days of receipt of the EEOC's right to sue letter.

## COUNT ONE
### Violation of the Fair Labor Standards Act
### 29 U.S.C. § 207
### (Failure to Pay Proper Overtime Wages)

62. Plaintiff incorporates by reference all preceding paragraphs as if the same were set forth again fully at this point.

63. At all relevant times, Defendant was, and continues to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA, 29 U.S.C. § 203.

64. At all relevant times, Defendant employed, and continues to employ, "employee[s]," including Plaintiff, that have been, and continue to be, engaged in interstate "commerce" within the meaning of the FLSA, 29 U.S.C. § 203.

65. At all relevant times, Defendant has had gross operating revenues in excess of $500,000.

66. The FLSA, pursuant to §§ 206 and 207, requires each covered employer, including Defendant, to compensate all non-exempt employees at the applicable minimum wage rate for all hours worked, and at a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

67. At all relevant times, Plaintiff was a covered employee pursuant to the FLSA and jointly employed by Defendant within the meaning of 29. U.S.C. § 203(e)(1) and subject to the provisions outlined in 29 U.S.C. § 207(k).

68. Plaintiff is not exempt from the requirements of the FLSA.

69. Plaintiff is entitled to be paid overtime and compensation for all hours worked over

forty (40) in a workweek pursuant to 29 U.S.C. § 207(a)(1).

70. During the relevant time period, Plaintiff regularly worked more than 90 hours per week. Therefore, Plaintiff was entitled to be paid one- and one-half times his regular rate for each hour worked in excess of forty (40) per week.

71. However, as a result of Defendant's policy of not compensating Plaintiff for all hours worked, including at a rate of one-and-one-half times his regular hourly rate for all hours over forty (40), Defendant did not compensate Plaintiff for all hours worked as required by the FLSA.

72. As Plaintiff's "time in" and "time out" entries are documented on Plaintiff's timesheets, Defendant was aware of all hours worked by Plaintiff and that Plaintiff was not receiving compensation for all hours worked, including the premium overtime rate for qualifying hours.

73. Defendant's actions, policies, and/or practices described herein therefore violate the FLSA, 29 U.S.C. § 207, by regularly and repeatedly failing to compensate Plaintiff for all hours worked, including compensation at the applicable overtime rate for all hours worked in excess of 40 per week.

74. Plaintiff is entitled to back wages at a rate of at least one- and one-half (1.5) times his regular rate of pay.

75. Defendant's unlawful pay practices of intentionally failing to compensate Plaintiff for all hours worked is in direct contrast to the express language of the FLSA, and Defendant's refusal to correct its practices even upon prior lawsuits allege violations of the FLSA. Accordingly, Defendant is unable to defend its failure to pay overtime wages as having been done in good faith, entitling Plaintiff to liquidated damages under 29 U.S.C. § 216(b).

# THE THREE-YEAR STATUTE OF LIMITATIONS SHOULD APPLY TO THIS CASE BECAUSE THE NON-PAYMENT OF OVERTIME IN VIOLATION OF 29 U.S.C. § 207(a)(1) WAS WILLFUL

76. Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

77. The three-year provision of 29 U.S.C. § 255(a) should apply in this case because the violation of 29 U.S.C. § 207(a)(1) was willful. Despite tracking all hours worked through a timekeeping system, requiring employees like Plaintiff to clock in and out for each shift, Defendant maintained a practice of not compensating plaintiff for all hours worked at the appropriate premium overtime rate. Defendant required Plaintiff work hours in excess of forty hours per week but would not document such hours on Plaintiff's paystubs.

78. Defendant has long been on notice that poultry catchers/loaders like Plaintiff must be paid overtime and minimum wage.

79. The Supreme Court in *Holly Farms corp. v. N.L.R.B.* affirmed the National Labor Relations Board's decision that chicken catchers were subject to the FLSA and were not exempt from overtime compensation. 116 S. Ct. 1396, 1405-06 (1996). The *Holly* decision put the poultry industry, including Defendant, on notice that poultry loaders should be paid for all hours worked at least minimum wage, and at time-and-a-half for all hours over forty (40) in a workweek. *See Heath v. Perdue Farms, Inc.*, 87 F. Supp. 2d 452, 462 (D. Md. 2000).

80. Similarly, the Department of Labor has frequently inquired into the pay practices at poultry companies, such that they should be on notice of their federal wage and hour obligations. In 2000, the United States Department of Labor ("DOL" found that 100% of the fifty-one (51) poultry plants surveyed had not paid employees for all hours worked, and 65% of the plants had misclassified workers as exempt. Kimberly D. Krone, *And You Don't Get Paid for That: Section 203(o) of the Fair Labor Standards Act Does Not apply to Donning and Doffing of Safety Gear*, 9

12
Case 5:20-cv-00585-D   Document 1   Filed 11/04/20   Page 12 of 19

Seton Hall Cir. Rev. 35, 72-73, n. 35 (2012).

81. More specifically, though, Defendant has regularly been subjected to litigation regarding its frequent and various violations of federal and state wage and hour law. *See Martinez-Hernandez v. Butterball, LLC*, No. 5:07-CV0174-H (2) (E.D.N.C. 2007); *see also Helmert v. Butterball, LLC*, No. 4:08-cv-00342-JLF (E.D. Ark. 2008).

82. Despite prior lawsuits and investigations, Defendant continued to short Plaintiff compensation for all hours worked.

83. The foregoing conduct, as alleged above, constitutes willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a), permitting the recovery of unpaid wages for up to three (3) years, rather than two (2) years.

## SECOND CAUSE OF ACTION
**Violation of the North Carolina Wage and Hour Act**
**N.C. Gen. Stat. § 95-25.1,** *et seq***.**

84. Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

85. At all relevant times, Defendant employed, and/or continues to employ, Plaintiff within the meaning of the NCWHA.

86. Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, it is unlawful for an employer to "suffer or permit" an employee to work without paying all owed, earned, and accrued promised wages, on the employee's regular payday.

87. Additionally, North Carolina law requires every employer to notify employees of the promised wages and the day of payment as well as making available a written version of the employment practices and policies regarding promised wages. *See* N.C. Gen. Stat. § 95-25.13(1)-(2).

88. 13 N.C. Admin. Code 12 § .0307(c) provides that any ambiguous policies and practices with respect to bonuses, commissions, and other forms of wage calculation "shall be construed against the employer and in favor of employees."

89. Pursuant to the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6, Defendant was required to pay Plaintiff all wages, when due, for all promised earned and accrued regular, straight, and overtime wages of one and one-half times the promised wage rate, which is a part of all the employees' accrued and earned wages, and which should have been paid when due on the employees' regular payday; this requirement is not covered by the overtime provision under the FLSA.

90. As documented on Plaintiff's paystubs, Defendant promised Plaintiff an hourly rate of approximately $18.08 an hour plus a premium rate of time and one half the regular rate for hours over 40 per week.

91. Defendant intentionally refused to pay all wages due as set forth in the preceding paragraphs of this Complaint to Plaintiff, including failing to compensate Plaintiff for all straight time at the promised hourly rate of $18.08 per hour, and at the promised premium overtime rate of $27.12 per hour, in violation of the NCWHA.

92. The foregoing conduct, as alleged, constitutes willful violations of the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6.

93. As set forth above, Plaintiff has sustained losses and lost compensation as a result of Defendant's violations. Accordingly, Plaintiff seeks damages in the amount of their unpaid earned compensation, liquidated damages, plus interest at the legal rate set for in N.C. Gen. Stat. § 95-25.22(a) and (a)(1).

94. Plaintiff, on behalf of himself and all those similarly situated, seeks recovery of his

14
Case 5:20-cv-00585-D   Document 1   Filed 11/04/20   Page 14 of 19

attorney's fees as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22(d).

## THIRD CAUSE OF ACTION
### Violation of the Americans with Disabilities Act
### For Failure to Accommodate and Retaliation
### 42 U.S.C. § 12101, *et seq*.

95. Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

96. The ADA prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

97. At all times material hereto, Plaintiff was an employee and Defendant his employer covered by and within the meaning of the ADA, 42 U.S.C. § 12111(4) and (5)(a).

98. At all times material hereto, Plaintiff was and is an individual with a disability within the meaning the ADA, 42 U.S.C. § 12102.

99. Plaintiff suffers from severe asthma, a respiratory impairment, which when exacerbated, prevents Plaintiff from breathing.

100. The physical contaminants in the air and extreme temperatures in Plaintiff's work area caused Plaintiff to suffer severe asthma attacks, impeding his ability to continue working and meeting Defendant's load expectations while simultaneously placing Plaintiff's health at great risk.

101. At all times relevant herein, Defendant has been aware of the provisions of the ADA, which prohibit employment discrimination on the basis of a disability.

102. Plaintiff notified Defendant of his chronic disorder and disability that required periodic treatment and minor accommodation of his work duties and working environment.

103. Plaintiff did not request any significant modification of his job functions, yet, upon information and belief, he was perceived to require excessive accommodation and was perceived to be a liability to Defendant.

104. Shortly after Plaintiff expressed concerns about Defendant's failure to properly accommodate his condition and the perception by his management team that he was disabled, Plaintiff was disciplined (including for taking time off work to attend doctors' appointments), threatened with further disciplinary action, denied reasonable accommodation, (despite Defendant acknowledging at least three similar positions at Defendant's plant that could accommodate Plaintiff's disability), sent home without pay, and ultimately terminated Plaintiff.

105. In denying reasonable accommodation, disciplining, and in terminating Plaintiff's employment, Defendant willfully, knowingly, and intentionally discriminated against Plaintiff on the basis of his disability.

106. As a result of the chronic condition, Plaintiff suffers from a disability within the meaning of the ADA, pursuant to 42 U.S.C. § 12102, in that Plaintiff has an impairment that substantially limits one or more of the major life activities, breathing, he has a record of such an impairment, and/or he is regarded as having such an impairment by managers of Defendant. Plaintiff's work life is affected as well as his personal life by the effects of his medical conditions as the asthma affects his ability to breath.

107. At all times relevant herein, Defendant has been aware of the provisions of the ADA, which prohibits discrimination in employment on the basis of disability.

108. The effect of Defendant's discrimination against Plaintiff for his disability has been to deprive Plaintiff of equal employment opportunities and is a direct violation of the ADA.

109. At all time relevant herein, Plaintiff performed his employment duties with skill

and attention to the best interests of Defendant.

110. As a proximate result of Defendant's conduct, as stated above, Plaintiff has sustained and continues to sustain substantial losses in earnings, retirement benefits, and other employment benefits, emotional distress, and pain and suffering, all to his damage in a sum in excess of $10,000.00.

111. In light of Defendant's willful, knowing, and intentional discrimination against Plaintiff,

112. Plaintiff seeks an award of liquidated damages equal to double the amounts of back pay found owing.

### FOURTH CAUSE OF ACTION
**Wrongful Discharge in Violation of North Carolina Public Policy**
**North Carolina Common Law**

113. It is the public policy of the State of North Carolina, as expressed in, *inter alia*, N.C. Gen. Stat. §§ 143-422.2, Article I, Section 1 of the North Carolina Constitution, and ubiquitously throughout the statutes and laws of this State, that employees be free from harassment, discrimination and retaliatory treatment in their employment. *See also* N.C. Gen .Stat. § 168A-5(a)(1) ("It is a discriminatory practice for: (1) An employer to fail to hire or consider for employment or promotion, to discharge, or otherwise to discriminate against a qualified person with a disability on the basis of a disabling condition with respect to compensation or the terms, conditions, or privileges of employment.")

114. The termination of Plaintiff's employment, resulting from his complaints and suffering related to the effects his working conditions had on his disability was wrongful as against the public policy of the State of North Carolina.

115. Such termination proximately caused Plaintiff to suffer emotional distress and other

losses, as described above. Accordingly, Plaintiff is entitled to compensatory damages under North Carolina law, and interest pursuant to N.C. Gen. Stat. § 24-5(b).

116. Defendant's acts constituted willful, wanton, and malicious conduct, entitling Plaintiff to punitive damages pursuant to Chapter 1D of the North Carolina General Statutes.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, prays that this Honorable Court:

1. Award Plaintiff actual damages for unpaid wages and liquidated damages equal in amount for the unpaid compensation found due to Plaintiff under the FLSA, U.S.C. § 216(b);

2. Award Plaintiff actual damages for unlawfully withheld wages and liquidated damages equal in amount as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22(a), (a1);

3. Award Plaintiff attorneys' fees, costs, and interest pursuant to the FLSA, U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a), (d);

4. Award Plaintiff pecuniary losses, interest, compensatory damages, and punitive damages, as a result of Defendant's violation of the ADA and violation of North Carolina Public Policy, pursuant to Chapter 1D of the North Carolina General Statutes and N.C. Gen. Stat. § 24-5(b); and

5. Award Plaintiff pre-judgment interest; and

6. Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted, November 4, 2020.

*/s/ Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Charlotte Smith (NCSB No. 53616)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513
Phone: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
csmith@gildahernandezlaw.com