IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-585-D

OSVALDO FIGUEROA,              )
                               )
          Plaintiff,           )
                               )
     v.                        )     **ORDER**
                               )
BUTTERBALL, LLC,               )
                               )
          Defendant.           )

On September 15, 2021, the court granted Butterball, LLC's ("Butterball" or "defendant") motion to dismiss Osvaldo Figueroa's ("Figueroa" or "plaintiff") first amended complaint and granted Figueroa leave to file a second amended complaint [D.E. 21]. See Figueroa v. Butterball, LLC, No. 5:20-CV-585-D, 2021 WL 4203652 (E.D.N.C. Sept. 15, 2021) (unpublished). On October 4, 2021, Figueroa filed a second amended complaint against Butterball alleging claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA") and the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et seq. ("NCWHA") [D.E. 22]. On November 1, 2021, Butterball moved to dismiss the second amended complaint under Federal Rule of Civil Procedure 12(b)(6) [D.E. 25] and filed a memorandum in support [D.E. 26]. On November 23, 2021, Figueroa responded in opposition [D.E. 28]. On December 10, 2021, Butterball replied [D.E. 31]. As explained below, the court grants in part and denies in part Butterball's motion to dismiss. The court dismisses with prejudice Figueroa's NCWHA claims. Figueroa may proceed with his FLSA claim.

I.

Butterball, a turkey producer, is a limited liability corporation with its principal place of business in Garner, North Carolina. See Second Am. Compl. [D.E. 22] ¶¶ 20–21. Figueroa is a

resident of Clinton, North Carolina, who worked as a poultry loader/catcher at Butterball's processing plant in Warsaw, North Carolina, from approximately May 8, 2017, to May 2019. See id. ¶¶ 19, 32–34. Figueroa's work catching and loading turkeys was "unskilled, repetitive, and rote." Id. ¶ 37. He had no authority over the hiring and firing of other employees, and he did not manage other employees. See id. ¶¶ 40–41.

Figueroa typically worked the night shift six days per week, from 6:30 p.m. until 9:30 a.m. the next day. See id. ¶ 42. Approximately once per month, the loaders/catchers' machines would break, causing Figueroa to work until 2:00 p.m. or 3:00 p.m. See id. Butterball provided "a one-hour, uninterrupted lunch break," but the "lunch break depended on the general pace of the production line." Id. ¶ 43. Figueroa alleges he worked approximately 90 hours per week. See id. ¶ 44.

During this litigation, Figueroa has given contradictory accounts of the compensation Butterball promised him at the beginning of his employment. In his original complaint, Figueroa alleged that Butterball "instructed [him] he would be paid on a piece-rate basis at a rate of $12 per truck load of turkeys" and would receive an overtime premium for all hours worked over 40 in a workweek. Compl. [D.E. 1] ¶ 36. Figueroa alleged he "load[ed] approximately 14-16 trucks" in a typical shift and "18-20 trucks per shift" during the holiday season. Id. ¶ 30. In his first amended complaint, Figueroa gave a similar account—i.e., that Butterball "instructed [him] he would be paid on a piece-rate basis at a rate of $12 per truck load of turkeys," and that his manager, Rocco, and a human resources ("HR") representative told Figueroa he would receive an overtime premium for all hours worked over 40 in a workweek. Am. Compl. [D.E. 13] ¶ 49. Figueroa again alleged he loaded approximately 14 to 16 trucks in a typical shift, and loaded approximately 18 to 20 trucks per shift during the holiday season. See id. ¶ 39.

2

In his second amended complaint, Figueroa tells a completely different story. He now alleges that Rocco and the HR representative told him "he would be paid an hourly rate and a premium rate of time and one-half his regular hourly rate for all hours over 40 per week." Second Am. Compl. ¶ 49. The HR representative translated Rocco's explanation of the terms of Figueroa's employment into Spanish for Figueroa. See id. Figueroa alleges it was his "understanding he would be compensated on an hourly basis, especially since there was no proper explanation of the piece-rate compensation system in conjunction with the promise to be compensated overtime for hours worked over 40 per week." Id. ¶ 50. Figueroa does not allege, however, what Rocco and the HR representative told him his hourly rate would be. Although Figueroa has previously estimated the number of trucks he loaded per shift, he now says "no record exist[s] documenting the number of loads" he completed. Id. ¶ 52. According to Figueroa, Butterball required Figueroa to track his daily hours worked, and Butterball reported what Figueroa characterizes as an hourly rate on his pay stub. See id. ¶ 56.

Figueroa's pay stubs state that a portion of Figueroa's wages were "LoadTrip" earnings. Id. ¶ 57. Figueroa alleges he did not understand what "LoadTrip" calculations were used to determine his pay, and he thought he was being paid hourly plus an overtime premium. See id. ¶¶ 57–58. Figueroa alleges that Butterball routinely paid him less than his regular hourly rate plus any applicable overtime premium for hours worked above 40 in a workweek. See id. ¶¶ 59–60.

As an example, Figueroa cites the pay period of January 22 to January 28, 2018. See id. ¶ 61. During that pay period, Figueroa worked 70.32 hours. The pay stub indicates Butterball paid Figueroa a "LoadTrip" amount of $1,184.64 and gross earnings (presumably including overtime) of $1,419.66. Id. ¶ 61. Figueroa alleges the pay stub lists an hourly rate of $18.54. See id. ¶ 62. Based on this pay stub and his allegations that Butterball instructed him that he would be paid hourly,

3

Figueroa alleges that during this pay period, Butterball underpaid him by $165.14. See id. Figueroa also alleges that Butterball "systemically undercalculate[d]" his wages. See id. ¶ 59.

Figueroa alleges that Butterball failed to pay proper overtime wages under the FLSA. See id. ¶¶ 86–101. Figueroa brings his FLSA claim as a collective action on behalf of himself and similarly situated employees. See id. ¶¶ 66–75. Figueroa also alleges NCWHA violations. See id. ¶¶ 111–26. Figueroa brings his NCWHA claims as a class action on behalf of himself and all similarly situated employees. See id. ¶¶ 76–85. Figueroa seeks collective action certification, class certification, and monetary damages. See id. at 23–24.

II.

Initially, Butterball argues the court should treat as judicial admissions the statements in Figueroa's first amended complaint that Figueroa contradicts in his second amended complaint. See [D.E. 26] 6–15. Alternatively, Butterball argues the court should strike the inconsistent pleadings from the second amended complaint. See id. Figueroa disagrees. See [D.E. 28] 12–17.

Figueroa's contradictory pleading to avoid a Rule 12(b)(6) dismissal is very troubling. Cf. Fed. R. Civ. P. 11(b)(3); United States ex rel. Nicholson v. MedCom Carolinas, Inc., No. 21-1290, 2022 WL 2838813, at *7–10 (4th Cir. July 21, 2022) (affirming district court decision to deny leave to amend complaint based on bad faith arising from plaintiff withholding information from the complaint without explanation and making misleading and inconsistent assertions). However, the tension between the judicial admissions doctrine and the nature of amended pleadings forecloses Butterball's argument.

Generally, "a party is bound by the admissions of his pleadings." Lucas v. Burnley, 879 F.2d 1240, 1242 (4th Cir. 1989) (quotation omitted); see Brown v. Sikora & Assocs., Inc., 311 F. App'x 568, 571 (4th Cir. 2008) (per curiam) (unpublished). Accordingly, "factual assertions in pleadings

4

and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them." White v. ARCO/Polymers, Inc., 720 F.2d 1391, 1396 (5th Cir. 1983).

A judicial admission is a representation that "go[es] to matters of fact which, otherwise, would require evidentiary proof." Everett v. Pitt Cnty. Bd. of Educ., 788 F.3d 132, 141 (4th Cir. 2015) (quotation omitted); see In re Motors Liquidation Co., 957 F.3d 357, 360 (2d Cir. 2020) (per curiam) ("To constitute a judicial admission, the statement must be one of fact—a legal conclusion does not suffice."); New Amsterdam Cas. Co. v. Waller, 323 F.2d 20, 24 (4th Cir. 1963). Such a representation is conclusive unless the court allows the party who made the representation to withdraw it. See Minter v. Wells Fargo Bank, N.A., 762 F.3d 339, 347 (4th Cir. 2014). A lawyer's statement on behalf of a client (i.e., a representation or waiver made outside the pleadings or a pretrial order) can be a judicial admission if it is "deliberate, clear, and unambiguous." Id. (quotation omitted); see Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty., 608 F.3d 183, 190 (4th Cir. 2010); Meyer v. Berkshire Life Ins. Co., 372 F.3d 261, 265 n.2 (4th Cir. 2004). The court has discretion to determine whether a representation constitutes a judicial admission. See Minter, 762 F.3d at 347.

"To qualify as a judicial admission, the statement must be (1) made in a judicial proceeding; (2) contrary to a fact essential to the theory of recovery; (3) deliberate, clear, and unequivocal; (4) such that giving it conclusive effect meets with public policy; and (5) about a fact on which a judgment for the opposing party can be based." Heritage Bank v. Redcom Laby's, Inc., 250 F.3d 319, 329 (5th Cir. 2001). If a party has made a binding judicial admission, a court may relieve a party of that admission if (1) "the admitted fact is clearly untrue" and (2) "the party [that made the admission] was laboring under a mistake when he made the admission." New Amsterdam Cas. Co., 323 F.2d at 24.

5

Figueroa made the factual representations at issue in his first amended complaint (i.e., as part of a judicial proceeding), they are contrary to his theory of recovery (as the court explained in its September 15, 2021 order), his factual representations were deliberate, clear, and unequivocal (especially because he made them in two complaints and relied on them in a brief, see [D.E. 19] 10–11), and the court relied on those factual allegations when granting Butterball's motion to dismiss. See Figueroa, 2021 WL 4203652, at *6. Thus, the court assumes without deciding that Figueroa's factual representations in his first amended complaint are judicial admissions that the court could appropriately give conclusive effect.

However, judicial admissions in a complaint "may be withdrawn by amendment." West Run Student Housing Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 171–72 (3d Cir. 2013); see InterGen N.V. v. Grina, 344 F.3d 134, 144–45 (1st Cir. 2003); 188 LLC v. Trinity Indus., Inc., 300 F.3d 730, 736 (7th Cir. 2002); Huey v. Honeywell, Inc., 82 F.3d 327, 333 (9th Cir. 1996); Hibernia Nat'l Bank v. Carner, 997 F.2d 94, 101 (5th Cir. 1993); White, 720 F.2d at 1396 & n.5; New Hickory Pizza, Inc. v. TIG Ins. Co., No. 5:16-cv-00164-RLV-DSC, 2017 WL 3840278, at *5–7 (W.D.N.C. Sept. 1, 2017) (unpublished); Midwestern Midget Football Club Inc. v. Riddell, Inc., Civil Action No. 2:15-00244, 2016 WL 3406129, at *5 (S.D.W. Va. June 17, 2016) (unpublished); Charter Oak Fire Co. v. Am. Cap., Ltd., Civil Action No. DKC 09-0100, 2016 WL 827380, at *8 (D. Md. Mar. 3, 2016) (unpublished). After all, "[a]n amended complaint supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader." InterGen, 344 F.3d at 145; see Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, 32 F.2d 195, 198 (2d Cir. 1929) ("When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated,

6

though controvertible, like any other extrajudicial admission made by a party or his agent.").

Even if the factual representations in Figueroa's first amended complaint are judicial admissions, Figueroa superseded those representations in his second amended complaint. See Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021) ("Ordinarily, an amended complaint supersedes those that came before it."); Young v. City of Mt. Ranier, 238 F.3d 567, 572 (4th Cir. 2001) ("As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect." (quotation omitted)). Accordingly, the court will consider the second amended complaint under the Rule 12(b)(6) standard, and the court declines to treat the representations in Figueroa's first amended complaint as conclusive judicial admissions or to strike the inconsistent allegations in his second amended complaint.

Nonetheless, Figueroa's factual representations in the first amended complaint were serious statements made to the court, and Butterball may rely on them as evidence in future proceedings in this case consistent with the Federal Rules of Evidence. See West Run, 712 F.3d at 172–73; InterGen, 344 F.3d at 144–45; 188 LLC, 300 F.3d at 735–36; Huey, 82 F.3d at 333; White, 720 F.2d at 1396; Raulie v. United States, 400 F.2d 487, 526 (10th Cir. 1968); Kunglig, 32 F.2d at 198. "For example, at the summary judgment stage, a district court may consider a statement or allegation in a superseded complaint as rebuttable evidence when determining whether summary judgment is proper." West Run, 712 F.3d at 173; cf. Goodman, 986 F.3d at 499. Likewise, Butterball may use the contradictory statements as admissions when examining Figueroa. Thus, the court addresses Figueroa's second amended complaint on the merits under the Rule 12(b)(6) standard.

III.

Butterball argues that even taking as true the allegations in Figueroa's second amended complaint, Figueroa fails to state a claim. See [D.E. 26] 15–27. A motion to dismiss under Rule

7

12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 353 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a party's factual allegations must "nudge[ ] [its] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court may also consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court

8

may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

Butterball's motion to dismiss requires the court to consider Figueroa's North Carolina state law claims. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[1] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

---

[1] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

9

A.

Figueroa alleges that Butterball violated the FLSA by failing to pay him and other loaders/catchers proper overtime wages. See Second Am. Compl. ¶¶ 86–101. Congress enacted the FLSA to "eliminate . . . substandard labor conditions," including substandard wages and oppressive overtime. Powell v. U.S. Cartridge Co., 339 U.S. 497, 510 (1950), superseded on other grounds by statute, e.g., Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, 80 Stat. 830; see Barrentine v. Ark.-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981); Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706–07 (1945), superseded on other grounds by statute, Portal-to-Portal Act of 1947, Pub. L. No. 80-49, 61 Stat. 84; Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F.3d 299, 304 (4th Cir. 2004); Gaxiola v. Williams Seafood of Arapahoe, Inc., 776 F. Supp. 2d 117, 124 (E.D.N.C. 2011). Under the FLSA, a covered employer must pay a covered employee at least minimum wage for the hours worked during each workweek. See 29 U.S.C. § 206; see Conner v. Cleveland Cnty., 22 F.4th 412, 420 (4th Cir. 2022), petition for cert. docketed, No. 21-1538 (U.S. June 8, 2022); Gaxiola, 776 F. Supp. 2d at 124. The FLSA applies to all non-exempt employees. See 29 U.S.C. § 203(e).

The FLSA requires a covered employer to pay a covered employee one and one-half times the employee's regular rate for all hours worked in excess of 40 hours per week, regardless of whether the employee is paid hourly, piece-rate, or under some other compensation system. See 29 U.S.C. § 207(a); Conner, 22 F.4th at 420; Roy v. Cnty. of Lexington, 141 F.3d 533, 538 (4th Cir. 1998); Turner v. BFI Waste Servs., LLC, 268 F. Supp. 3d 831, 836 (D.S.C. 2017). "To assert a claim for overtime compensation pursuant to 29 U.S.C. § 207, a plaintiff must plead (1) that he worked overtime hours without compensation; and (2) that the employer knew or should have known that he worked overtime but failed to compensate him for it." Butler v. DirectSat USA, LLC, 800

10

F. Supp. 2d 662, 667 (D. Md. 2011) (quotation omitted); see Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986).

To survive a motion to dismiss, plaintiffs "must do more than merely allege that they regularly worked in excess of forty hours per week without receiving overtime pay." Hall v. DIRECTV, LLC, 846 F.3d 757, 777 (4th Cir. 2017). Instead, plaintiffs must plausibly allege sufficient details concerning the "length and frequency of their unpaid work" to allow the court to reasonably infer that they worked more than 40 hours in a given workweek. Id. (quotation omitted); see Williams v. Imeni, No. 5:16-CV-516-FL, 2017 WL 2266849, at *3 (E.D.N.C. May 23, 2017) (unpublished). "A plaintiff may meet this initial standard by estimating the length of her average workweek during the applicable period and the average rate at which she was paid, the amount of overtime wages she believes she is owed, or any other facts that will permit the court to find plausibility." Hall, 846 F.3d at 777 (quotation and emphasis omitted); see Acosta v. Ararat Imp. & Exp. Co., 378 F. Supp. 3d 443, 447 (E.D.N.C. 2019); Chado v. Nat'l Auto Inspections, LLC, Civil No. JKB-17-2945, 2018 WL 6198722, at *2–4 (D. Md. Nov. 28, 2018) (unpublished). Plaintiffs need not "identify a particular week in which they worked uncompensated overtime hours." Hall, 846 F.3d at 777 (emphasis omitted); see Williams, 2017 WL 2266849, at *3.

As for the first element, Figueroa must plausibly allege that he worked overtime hours without proper compensation. See Hall, 846 F.3d at 777; Butler, 800 F. Supp. 2d at 667. Figueroa alleges that he consistently worked approximately 90 hours per week. See Second Am. Compl. ¶ 44. That allegation is implausible for two reasons. First, Figueroa's estimate of his hours does not support the conclusion that Figueroa consistently worked 90 hours per week. Figueroa alleges that during non-holiday shifts, he worked 6:30 p.m. to 9:30 a.m. with a one-hour, uninterrupted lunch break, six days per week. See id. ¶¶ 42–43. A 6:30 p.m. to 9:30 a.m. shift, minus a one-hour lunch

11

break, is a 14-hour shift. See 29 C.F.R. § 785.19 ("Bona fide meal periods are not worktime."); Roy, 141 F.3d at 544–46. Six 14-hour shifts yields an 84-hour workweek. Although Figueroa alleges he could not take a lunch break "when the workflow was heavy," he does not allege how often that occurred in a given week (at least outside the holiday season). Second Am. Compl. ¶ 43. To get from 84 to 90 hours, Figueroa alleges that approximately once per month, the machines he used to do his job broke and he would work until, at most, 3:00 p.m. (i.e., an additional six hours). See id. ¶ 42. Thus, during non-holiday shifts, Figueroa alleges that he may work 90 hours one week per month but that most weeks he worked less than 90 hours per week.

Second, none of the pay stubs in the record support Figueroa's allegations of consistent 90-hour workweeks. Figueroa alleges that "[f]rom November to early February each year," Butterball required Figueroa to work significantly more than 90 hours per week "to meet holiday demands." Id. ¶ 45. During the holiday season, Figueroa alleges Butterball required him to "typically work seven days a week" and that he could only "take one to three days off during any given holiday season," meaning Figueroa and other loaders/catchers would work "nearly ninety (90) days straight, without a day off." Id. But the pay stubs in the record are from mid-January to early February 2018—i.e., the holiday season during which Figueroa alleges he consistently worked more than 90 hours per week. The pay stub for the week of January 15, 2018, indicates Figueroa worked 66.18 hours. See [D.E. 17-1] 2. The pay stub for the week of January 22, 2018, indicates Figueroa worked 70.32 hours. See [D.E. 25-2] 2. The pay stub for the week of January 29, 2018, indicates Figueroa worked 52.26 hours. See id. at 3. And the pay stub for the week of February 5, 2018, indicates Figueroa worked 65.30 hours. See id. at 4.[2] These pay stubs call into doubt Figueroa's allegations

---

[2] Although in his memorandum in opposition to Butterball's motion to dismiss Figueroa argues the pay stubs do not reflect the hours Figueroa actually worked, see [D.E. 28] 24, he does not

12

concerning his hours worked during the holiday season and his estimates of his non-holiday hours.

Nonetheless, taking the second amended complaint and the pay stubs together, Figueroa plausibly alleges he regularly worked more than 40 hours in a given workweek, although he does not plausibly allege that he consistently worked 90 hours per week. Figueroa's 90-hours-per-week allegation is plainly an exaggeration. Nonetheless, Figueroa plausibly alleges that Butterball regularly owed him overtime pay because Figueroa worked more than 40 hours per week.

Figueroa must also plausibly allege he was not paid a proper overtime premium for the hours he worked over 40 in a given workweek. In evaluating whether Butterball properly paid Figueroa for his overtime work, the parties dispute whether Butterball paid Figueroa an hourly wage or paid him pursuant to a piece-rate system.

In the second amended complaint, Figueroa alleges that a Butterball HR representative and Rocco told Figueroa "he would be paid an hourly rate and a premium rate of time and one-half his regular hourly rate for all hours over 40 per week." Second Am. Compl. ¶ 49. Although Figueroa alleges that the HR representative and Rocco told him the "terms of employment," Figueroa does not allege what Rocco and the HR representative told him would be his hourly rate. Id. Instead, Figueroa relies on his pay stubs for evidence of his hourly rate. See id. ¶ 62. In his NCWHA allegations, Figueroa alleges that the pay stubs document a promised rate of "approximately $18.08 an hour, and up to $ 18.54 an hour." Second Am. Compl. ¶¶ 120–21. None of the pay stubs in the

---

allege facts in his second amended complaint to support that argument. Cf. Odjaghian v. HHS Tech. Grp., LLC, 848 F. App'x 534, 541–42 (4th Cir. 2021) (unpublished). Instead, Figueroa alleges that Butterball required him to clock in and out, and that Butterball "maintain[s] records that document all hours worked by Plaintiffs each pay period." Second Am. Compl. ¶¶ 56, 59. Moreover, although Figueroa attempts to dispute the authenticity of the pay stubs, he affirmatively relies on the same pay stubs in his second amended complaint without questioning their accuracy. Compare id. ¶¶ 61–62 & n.1, with [D.E. 28] 24. Figueroa cannot have it both ways.

13

record make any reference to $18.08, as an hourly rate or otherwise. See [D.E. 17-1, 25-2]. Figueroa alleges no other basis for using an $18.08 hourly rate, rendering that alleged hourly rate implausible. His pay stubs have a line at the top marked "Rate: 18.54." See, e.g., [D.E. 25-2] 2. The pay stubs do not further define what "Rate" means. Figueroa alleges that this line refers to his hourly rate and that the court should use $18.54 as his base hourly rate to evaluate whether he plausibly alleges that Butterball failed to pay the overtime wages it owed to him. See Second Am. Compl. ¶ 62. Based on that hourly rate, Figueroa argues Butterball regularly underpaid his promised overtime wages. See id.

In this court's September 15, 2021 order, the court noted that "Figueroa's paystub belies Figueroa's contention that he should have been paid an hourly rate. The paystub reflects piece-rate compensation." Figueroa, 2021 WL 4203652, at *5. Figueroa now alleges Butterball promised him hourly wages at the beginning of his employment. See Second Am. Compl. ¶ 49. Butterball disputes this allegation and argues it is irrelevant because Figueroa worked for two years under a piece-rate scheme without ever questioning his pay and that Figueroa's pay stubs unambiguously show piece-rate pay. See [D.E. 26] 16–24.

At this point, the court need not resolve this factual dispute. Even assuming Butterball used a piece-rate compensation system to calculate Figueroa's pay, one of the pay stubs in the record indicates Butterball underpaid Figueroa. The pay stub for the week of January 22, 2018, on which Figueroa principally relies in his second amended complaint, shows that Butterball underpaid Figueroa for his overtime hours during that week, even assuming a piece-rate system and even after rejecting Figueroa's implausible allegations that he worked 90 hours that week. Cf. Goines, 822 F.3d at 166 ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." (quotation omitted)). Figueroa's pay stub shows that he earned

$1,184.64 in "LoadTrip" pay. [D.E. 25-2] 2. It also notes next to the "AttendHr" line that Figueroa worked 70.32 hours. Id. And the pay stub shows that Butterball paid Figueroa $235.02 in overtime pay. See id.

A covered employer must convert piece-rate earnings to an hourly rate to determine whether the earnings comply with overtime pay requirements. See 29 C.F.R. § 778.111(a); see also Turner, 268 F. Supp. 3d at 836 ("A non-exempt employee's 'regular rate' of pay provides the basis for calculation of his overtime rate."). FLSA regulations provide a formula for calculating overtime pay based on piece-rate compensation. The FLSA regulations state:

> When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions). This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's "regular rate" for that week. For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week.

29 C.F.R. § 778.111(a); see Turner, 268 F. Supp. 3d at 836–37; Alston v. DIRECTV, Inc., 254 F. Supp. 3d 765, 792 (D.S.C. 2017); see also 29 U.S.C. § 207(g); Pest v. Bridal Works of N.Y., Inc., 268 F. Supp. 3d 413, 427–28 (E.D.N.Y. 2017).

For the week of January 22, 2018, Butterball underpaid Figueroa. The pay stub shows Figueroa earned $1,184.64 in "LoadTrip" or piece-rate pay and worked 70.32 hours. See [D.E. 25-2] 2. Dividing $1,184.64 by 70.32 hours yields a "regular rate" of approximately $16.85. Thus, Butterball needed to pay Figueroa an additional $8.43 per hour that Figueroa worked over 40. According to the pay stub, Figueroa worked 30.32 overtime hours the week of January 22, 2018 (i.e., 70.32 minus 40). Thus, Butterball owed Figueroa approximately $255.60 in overtime pay.

15

However, Butterball only paid Figueroa $235.02 in overtime wages, underpaying him by $20.58.[3] Thus, even assuming Butterball used a piece-rate system to calculate Figueroa's pay, Figueroa has identified a week during which Butterball underpaid him. See [D.E. 28] 23–24 (arguing Butterball underpaid Figueroa for the week of January 22, 2018, even assuming a piece-rate system, but using the implausible 90-hours-per-week estimation for the calculation).

As for whether Butterball knew or should have known Figueroa worked overtime, Figueroa plausibly alleges Butterball required him to clock in and out, and that Butterball "maintain[s] records that document all hours worked by Plaintiffs each pay period." Second Am. Compl. ¶¶ 56, 59.

The court declines to resolve whether Butterball promised to pay Figueroa hourly or piece-rate and what the significance of either promise would be. At this stage, Figueroa needed to plausibly allege that he worked overtime hours without compensation and that Butterball knew or should have known that he worked overtime but failed to compensate him for his overtime hours. See Butler, 800 F. Supp. 2d at 667. Viewing the second amended complaint, the pay stubs, and all reasonable inferences drawn therefrom in the light most favorable to Figueroa, Figueroa's FLSA claim narrowly ekes across the plausibility line. Whether it will survive Butterball's inevitable motion for summary judgment is an issue for another day. Cf. West Run, 712 F.3d at 173; Griffin v. Wake Cnty., 142 F.3d 712, 717 (4th Cir. 1998).

B.

Butterball argues that Figueroa has not plausibly alleged an NCWHA claim. See [D.E. 26] 24–25. For the reasons stated in the court's September 15, 2021 order, the NCWHA's exemption from the overtime provision of the NCWHA for persons covered by the FLSA bars Figueroa from

---

[3] The court has reviewed the other three pay stubs in the record, and for the weeks they represent, Butterball paid Figueroa more than the FLSA regulations require for those pay periods.

recovering overtime wages under the NCWHA. See Figueroa, 2021 WL 4203652, at *6–8. However, Figueroa may state an NCWHA pay day claim if he alleges a separate and distinct claim from his FLSA overtime claim. See id.

Figueroa alleges that Butterball promised to pay him hourly wages. See Second Am. Compl. ¶ 49. The crux of Figueroa's NCWHA claim is that Butterball "fail[ed] to compensate [Figueroa] for all straight time at the promised hourly rate of $18.08 per hour, and at the promised premium overtime rate of $27.12 per hour." Second Am. Compl. ¶ 121. Figueroa does not allege what the HR representative and Rocco told him his hourly wages would be at the beginning of his employment. See id. ¶ 49. Instead, Figueroa alleges that his pay stubs document a promise from Butterball to pay him an $18.08 hourly wage that could go up to $18.54 per hour. See id. ¶¶ 120–21. But none of the pay stubs in the record contain the number "18.08" much less show that it was an hourly rate Butterball promised to pay Figueroa. Moreover, Figueroa provides no explanation of how or why his hourly rate would fluctuate between $18.08 and $18.54 per hour. To the extent Figueroa argues that the phrase "Rate: 18.54" on his pay stubs refers to an hourly rate, Figueroa offers no reason to infer that is the case other than his vague allegation that the HR representative and Rocco promised him an unspecified hourly wage. Plus, if Figueroa thought Butterball should be paying him $18.54 per hour, then it makes little sense to allege that Butterball promised, on Figueroa's pay stubs, to pay him $18.08 per hour. Figueroa's allegations concerning his hourly wages for his NCWHA claim are contradictory and fail to state a claim.

As for Figueroa's allegations that Butterball violated the NCWHA's notice requirements pursuant to N.C. Gen. Stat. § 95-25-13, they fail to state a claim for the reasons stated in the court's September 15, 2021 order. See Figueroa, 2021 WL 4203652, at *8–9. After all, Figueroa states in his second amended complaint that when Butterball hired him, Butterball orally informed Figueroa

17

that he would be paid hourly. See Second Am. Compl. ¶ 49. Moreover, Figueroa insists that his pay stubs unambiguously show hourly pay. See id. ¶¶ 55, 120. Assuming that is true, Butterball provided Figueroa with access to policies and practices regarding promised wages through a statutorily authorized means. See 13 N.C. Admin. Code. 12.0805(a), (b)(2). Thus, the claim fails, and the court dismisses with prejudice Figueroa's NCWHA claims.

IV.

Butterball argues that the court should strike Figueroa's collective action allegations or require Figueroa to provide a more definite statement. See [D.E. 26] 27–35. Figueroa has not yet filed a motion for conditional certification under 29 U.S.C. § 216(b). See, e.g., Pontones v. San Jose Rest. Inc., No. 5:18-CV-219-D, 2019 WL 5680347, at *1–9 (E.D.N.C. Oct. 31, 2019) (unpublished); Sheffield v. BB&T Corp., No. 7:16-CV-332-BO, 2017 WL 1831091, at *1–2 (E.D.N.C. May 4, 2017) (unpublished). The court declines to address the collective action allegations at this stage and will address them if Figueroa files a motion to certify a collective action and the issue is fully briefed. Cf. Bigelow v. Syneos Health, LLC, No. 5:20-CV-28-D, 2020 WL 5078770, at *4 (E.D.N.C. Aug. 27, 2020) (unpublished) ("[C]ourts rarely make a class determination at the pleading stage."). Nothing in this order determines whether the court will allow this case to proceed as a collective action. See Sanchez v. Truse Trucking, Inc., 74 F. Supp. 3d 716, 718 n.1 (M.D.N.C. 2014).

V.

In sum, the court GRANTS IN PART and DENIES IN PART defendant's motion to dismiss [D.E. 25]. The court DISMISSES WITH PREJUDICE plaintiff's NCWHA claims. Plaintiff may proceed with his FLSA claim. The parties SHALL confer and file a discovery plan pursuant to Federal Rule of Civil Procedure 26.

18

SO ORDERED. This 27 day of July, 2022.

JAMES C. DEVER III
United States District Judge