IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-585-D

OSVALDO FIGUEROA,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )          **ORDER**
                                     )
BUTTERBALL, LLC,                     )
                                     )
                Defendant.           )

On November 4, 2020, Osvaldo Figueroa ("Figueroa" or "plaintiff") filed a complaint against Butterball, LLC ("Butterball" or "defendant") seeking relief for alleged unpaid wages [D.E. 1]. Numerous motions are pending. As explained below, the court grants Butterball's motion for summary judgment, denies Figueroa's motion for summary judgment, denies as moot Figueroa's motion for equitable tolling and Butterball's motion to strike, and grants Figueroa's motion to dismiss the claims of opt-in plaintiff David Adams ("Adams").

I.

On December 31, 2020, Butterball moved to dismiss Figueroa's complaint for failure to state a claim upon which relief can be granted [D.E. 11] and filed a memorandum in support [D.E. 12]. See Fed. R. Civ. P. 12(b)(6). On January 20, 2021, Figueroa filed an amended complaint [D.E. 13] and responded in opposition to Butterball's motion to dismiss [D.E. 14]. On March 5, 2021, Butterball moved to dismiss Figueroa's amended complaint for failure to state a claim [D.E. 17] and filed a memorandum in support [D.E. 18]. See Fed. R. Civ. P. 12(b)(6). On March 24, 2021, Figueroa responded in opposition [D.E. 19]. On April 7, 2021, Butterball replied [D.E. 20]. On September 15, 2021, the court denied as moot Butterball's motion to dismiss Figueroa's

complaint, granted Butterball's motion to dismiss Figueroa's amended complaint, and dismissed Figueroa's amended complaint [D.E. 21].

On October 4, 2021, Figueroa filed a second amended complaint against Butterball alleging failure to pay overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 203 et seq., and violations of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. §§ 95-25.1 et seq. [D.E. 22]. On November 1, 2021, Butterball moved to dismiss Figueroa's second amended complaint for failure to state a claim and to strike Figueroa's contradictory amendments and collective action and class action allegations and, alternatively, for Figueroa to provide a more definite statement [D.E. 25] and filed a memorandum in support [D.E. 26]. See Fed. R. Civ. P. 12(b)(6), (e), (f). On November 23, 2021, Figueroa responded in opposition [D.E. 28]. On December 10, 2021, Butterball replied [D.E. 30]. On July 27, 2022, the court granted in part and denied in part Butterball's motion and dismissed with prejudice Figueroa's NCWHA claims [D.E. 32].

On August 10, 2022, Figueroa moved for reconsideration of the court's July 27, 2022 order [D.E. 35] and filed a memorandum in support [D.E. 36]. On August 31, 2022, Butterball responded in opposition [D.E. 39]. On September 14, 2022, Figueroa replied [D.E. 40]. On September 29, 2022, the court denied Figueroa's motion for reconsideration [D.E. 42].

On October 13, 2022, Figueroa moved to conditionally certify this action as a collective action under section 216(b) of the FLSA [D.E. 44] and filed a memorandum in support [D.E. 45]. On November 18, 2022, the parties jointly notified the court that Butterball did not oppose Figueroa's motion to conditionally certify the action as a collective action [D.E. 49]. On January 25, 2023, Figueroa filed an amended unopposed motion to conditionally certify this action as a collective action [D.E. 57] and filed a memorandum in support [D.E. 58]. On January 26, 2023,

2

Butterball notified the court that Figueroa's motion was "either . . . a new motion, for which [Figueroa] did not seek Butterball's approval before stating Butterball's non-opposition; or this motion is duplicative" [D.E. 59]. Nonetheless, Butterball did not oppose the relief Figueroa requested in his motion. See id.

On April 10, 2023, Figueroa moved for equitable tolling [D.E. 85] and filed a memorandum in support [D.E. 86]. On April 20, 2023, Figueroa again moved for reconsideration of the court's July 27, 2022 order [D.E. 87] and filed a memorandum in support [D.E. 88]. On April 28, 2023, Butterball responded in opposition to Figueroa's motion for equitable tolling [D.E. 89]. On May 11, 2023, Butterball responded in opposition to Figueroa's motion for reconsideration [D.E. 97]. On May 19, 2023, Figueroa replied in support of his motion for equitable tolling [D.E. 101]. On May 22, 2023, Figueroa replied in support of his motion to reconsider [D.E. 104].

On July 17, 2023, the court granted Figueroa's first motion for conditional collective certification, denied Figueroa's "amended unopposed" motion for conditional collective certification, and approved distribution of the notice form and consent form [D.E. 119]. The same day, the court denied as meritless Figueroa's motion for reconsideration [D.E. 120].

On September 6, 2023, Jeffrey Rouse ("Rouse") consented to join the collective action. See [D.E. 131]. On September 8, 2023, Chet Peterson ("Peterson") consented to join the collective action. See [D.E. 132]. On September 14, 2023, David Webb ("Webb") and Jason Raynor ("Raynor") consented to join the collective action. See [D.E. 133]. On September 21, 2023, Timothy Jermaine Evans ("Evans") consented to join the collective action. See [D.E. 134]. On October 10, 2023, Cleveland Bright Jr. ("Bright") consented to join the collective action. See [D.E. 138]. On October 16, 2023, Juan Lazo Umana ("Lazo") consented to join the collective action. See [D.E. 139]. On October 24, 2023, Adams (collectively "opt-in plaintiffs")

3

(collectively, with Figueroa, "plaintiffs") consented to join the collective action. See [D.E. 140]. On January 10, 2024, the court denied Figueroa's motion for equitable tolling [D.E. 160].

On January 19, 2024, Butterball moved for summary judgment and to decertify the collective action [D.E. 161] and filed a memorandum in support [D.E. 162], a statement of material facts [D.E. 163], and an appendix of exhibits [D.E. 164]. The same day, Figueroa moved for summary judgment [D.E. 165] and filed a statement of material facts [D.E. 166], an appendix of exhibits [D.E. 166-1 to 166-13], and a memorandum in support [D.E. 167]. On February 15, 2024, Figueroa responded in opposition [D.E. 172] and filed a response statement of material facts [D.E. 173]. The same day, Figueroa again moved for equitable tolling [D.E. 174] and filed a memorandum in support [D.E. 175]. On February 23, 2024, Butterball responded in opposition to Figueroa's motion for summary judgment [D.E. 176] and filed a response statement of material facts [D.E. 177] and an appendix of exhibits [D.E. 178]. On March 7, 2024, Butterball responded in opposition to Figueroa's motion for equitable tolling [D.E. 179]. On March 13, 2024, Figueroa replied in support of his motion for summary judgment [D.E. 186] and filed a reply statement of material facts [D.E. 184] and a summary of unpaid wages [D.E. 185]. On March 15, 2024, Butterball replied in support of its motion for summary judgment [D.E. 187]. On March 20, 2024, Figueroa replied in support of his motion for equitable tolling [D.E. 188].

On March 27, 2024, Butterball moved to strike Figueroa's summary of unpaid wages [D.E. 189] and filed a memorandum in support [D.E. 190]. On April 17, 2024, Figueroa moved to dismiss with prejudice opt-in plaintiff Adams's claims [D.E. 191]. The same day, Figueroa responded in opposition to Butterball's motion to strike [D.E. 192]. On May 1, 2024, Butterball replied in support of its motion to strike [D.E. 194].

4

## II.

Butterball is one of the largest turkey producers in the United States. See Def.'s Statement of Material Facts ("DSMF") [D.E. 163] ¶ 1; Pl.'s Response Statement of Material Facts ("PRSMF") [D.E. 173] ¶ 1. Plaintiffs worked as turkey loaders or turkey catchers for Butterball. Compare DSMF ¶¶ 3, 22–48, and Def.'s Response Statement of Material Facts ("DRSMF") [D.E. 177] ¶¶ 1–11, 33, with PRSMF ¶¶ 3, 22–48, and Pl.'s Statement of Material Facts ("PSMF") [D.E. 166] ¶¶ 1–11, 33. Plaintiffs' job responsibilities included traveling to turkey farms to load turkeys on trucks to send them to processing plants. Compare DSMF ¶¶ 4–8, with PRSMF ¶¶ 4–8. Beginning in 2014, Butterball classified turkey catchers and loaders as non-exempt employees entitled to overtime. Compare DSMF ¶ 228, with PRSMF ¶ 228.

At all relevant times, Russell Jones ("Jones") was a Live Haul Manager with Butterball who supervised plaintiffs. See PSMF ¶ 32; DRSMF ¶ 32; compare DSMF ¶ 10, with PRSMF ¶ 10. At all relevant times, Yvonne Sanderson ("Sanderson") worked as Butterball's Corporate Payroll Manager. See PSMF ¶ 27; DRSMF ¶ 27. At all relevant times, Carey Howerton ("Howerton") served as Butterball's Director of Human Resources ("HR"). See PSMF ¶ 28; DRSMF ¶ 28. Renee Arthur ("Arthur") served as an HR Manager for Butterball. See PSMF ¶ 29; DRSMF ¶ 29. Gary Batchelor ("Batchelor") currently serves as a loading crew supervisor for Butterball and previously worked as a turkey loader. See DSMF ¶ 19; PRSMF ¶ 19.

Jones and Arthur participated in Figueroa's interview process for Butterball. See DSMF ¶ 50; PRSMF ¶ 50. During interviews, Jones explained to applicants that Butterball would pay them based on the number of truckloads of turkeys they loaded. Compare DSMF ¶¶ 57–58, with PRSMF ¶¶ 57–58. After an interview, if Butterball decided to hire an applicant, HR would provide an offer letter to the applicant for the applicant to sign. See [D.E. 164-3] 97–100. On April 25,

5

2017, Figueroa signed his Butterball offer letter. See [D.E. 164-15] 31–32. In the offer letter, Butterball specified that it would pay Figueroa "a load rate of $10.80" plus overtime. Id. at 31. Butterball similarly informed other plaintiffs that Butterball would pay them per truckload in their interviews, offer letters, and onboarding. Compare DSMF ¶¶ 89–123, with PRSMF ¶¶ 89–123. Some onboarding documents used the word "hourly" in reference to plaintiffs' jobs. Compare PSMF ¶¶ 62–64, 70, 72, with DRSMF ¶¶ 62–64, 70, 72. On May 16, 2017, Figueroa started work. See DSMF ¶ 49.i.; PRSMF ¶ 49.i.; see also [D.E. 164-15] 35–42 (onboarding paperwork).

Plaintiffs' workweek ran from Sunday to Saturday. See DSMF ¶¶ 126–30; PRSMF ¶¶ 126–30. Plaintiffs' schedules and hours varied. See PSMF ¶ 54; DRSMF ¶ 54. Butterball tracked plaintiffs' hours using a punch clock. Compare DSMF ¶¶ 131–38, 146, with PRSMF ¶¶ 131–38, 146. Butterball aggregated plaintiffs' clock-in and clock-out data into "punch detail reports." Compare DSMF ¶ 143, with PRSMF ¶ 143. Butterball used plaintiffs' hours worked to calculate their overtime pay. Compare DSMF ¶¶ 195–96, with PRSMF ¶¶ 195–96. Plaintiffs' paystubs generally display, inter alia, three figures: "OT Hours," "LoadTrip," and "AttendHr." See [D.E. 166-6]. "OT Hours" shows overtime pay, "LoadTrip" shows base pay, and "AttendHr" shows a calculation of hours worked during that pay period. Compare DSMF ¶¶ 196, 200, 204, with PRSMF ¶¶ 196, 200, 204. The figure in "AttendHr," however, accounted for Sunday shifts differently than how Butterball tracked pay periods, leading to some discrepancies between the hours reflected under "AttendHr" and the hours plaintiffs worked during the relevant pay period. Compare DSMF ¶¶ 205–06, with PRSMF ¶¶ 205–06. For this reason, Butterball did not use the "AttendHr" figures to calculate plaintiffs' overtime pay. Compare DSMF ¶ 210, with PRSMF ¶ 210.

6

## III.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation

7

or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

Figueroa alleges that Butterball failed to pay plaintiffs proper overtime wages in violation of the FLSA. See 2d Am. Compl. [D.E. 22] ¶¶ 86–101. Congress enacted the FLSA to "eliminate . . . substandard labor conditions," including substandard wages and oppressive working hours. Powell v. U.S. Cartridge Co., 339 U.S. 497, 510 (1950), superseded on other grounds by statute, e.g., Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, 80 Stat. 830; see Barrentine v. Ark.-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981); Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706–07 (1945), superseded on other grounds by statute, Portal-to-Portal Act of 1947, Pub. L. No. 80-49, 61 Stat. 84; Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F.3d 299, 304 (4th Cir. 2004); Gaxiola v. Williams Seafood of Arapahoe, Inc., 776 F. Supp. 2d 117, 124 (E.D.N.C. 2011). Under the FLSA, a covered employer must pay a covered employee at least minimum wage for the hours worked during each workweek. See 29 U.S.C. § 206; see Conner v. Cleveland Cnty., 22 F.4th 412, 420 (4th Cir. 2022), cert. denied, 143 S. Ct. 523 (2022); Gaxiola, 776 F. Supp. 2d at 124. The FLSA applies to all non-exempt employees. See 29 U.S.C. § 203(e).

The FLSA requires a covered employer to pay a covered employee overtime for all hours worked in excess of 40 hours per week, regardless of whether the employee is paid hourly, piece-rate, or under some other compensation system. See 29 U.S.C. § 207(a); Conner, 22 F.4th at 420; Roy v. Cnty. of Lexington, 141 F.3d 533, 538 (4th Cir. 1998); Turner v. BFI Waste Servs., LLC, 268 F. Supp. 3d 831, 836 (D.S.C. 2017). To survive summary judgment, a plaintiff must forecast evidence "(1) that he worked overtime hours without compensation; and (2) that the employer knew or should have known that he worked overtime but failed to compensate him for it." Butler

8

v. DirectSat USA, LLC, 800 F. Supp. 2d 662, 667 (D. Md. 2011) (quotation omitted); see Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986).

### A.

Butterball contends that it told plaintiffs when it hired them that it would pay plaintiffs piece-rate, i.e., per truckload of turkeys. See [D.E. 162] 11–21; [D.E. 176] 20–27; [D.E. 187] 5–8. Figueroa responds that Butterball paid plaintiffs hourly. See [D.E. 167] 16–21; [D.E. 172] 12–16; [D.E. 186] 10–11.

The FLSA "does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or other basis." 29 C.F.R. § 778.109 (emphasis added). In a piece-rate system, a worker is paid by the job or by the product. See Hall v. DIRECTV, LLC, 846 F.3d 757, 773 (4th Cir. 2017); Alvarado v. Corp. Cleaning Servs., Inc., 782 F.3d 365, 367 (7th Cir. 2015) ("In a piece-rate system a worker is paid by the item produced by him: so much per scarf, for example, if his job is to make scarves."). Piece-rate compensation is lawful when it is "pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work." 29 U.S.C. § 207(g). The agreement or understanding need not be in writing. See Griffin v. Wake Cnty., 142 F.3d 712, 716 (4th Cir. 1998); Amador v. Guardian Installed Servs. Inc., 575 F. Supp. 2d 924, 929 (N.D. Ill. 2008). The parties, however, must agree that the employer is compensating the employee for all hours worked, including nonproductive hours. An employer can demonstrate "the existence of [a] clear mutual understanding from employment policies, practices, and procedures." Griffin, 142 F.3d at 717 (quotation omitted). The employer also must comply with the FLSA's overtime provisions. See 29 C.F.R. §§ 778.111(a), 778.318; Hall, 846 F.3d at 773.

9

"[A]t the summary judgment stage, a district court may consider a statement or allegation in a superseded complaint as rebuttable evidence when determining whether summary judgment is proper." W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 173 (3d Cir. 2013); see Goodman v. Diggs, 986 F.3d 493, 499 (4th Cir. 2021); Figueroa v. Butterball, LLC, No. 5:20-CV-585, 2022 WL 2980749, at *4 (E.D.N.C. July 27, 2022) (unpublished) ("Figueroa II"). Figueroa filed three complaints in this action. See [D.E. 1, 13, 22]. In Figueroa's first two complaints, Figueroa alleged that Butterball hired him and the opt-in plaintiffs as piece-rate employees. See [D.E. 1] ¶¶ 36–37; [D.E. 13] ¶¶ 48–50. Figueroa's second amended complaint contains "contradictory [allegations] to avoid a Rule 12(b)(6) dismissal." Figueroa II, 2022 WL 2980749, at *2; see [D.E. 22] ¶¶ 49–53. Thus, Figueroa's first two complaints are rebuttable evidence that plaintiffs and Butterball agreed to piece-rate compensation. See W. Run, 712 F.3d at 173; Figueroa II, 2022 WL 2980749, at *4.

Figueroa's signed offer letter from Butterball stated that Butterball would pay Figueroa "a load rate of $10.80." [D.E. 164-15] 31. Butterball specified piece-rate pay in several opt-in plaintiffs' signed offer letters. See [D.E. 164-15] 97 ("You will be paid a load rate of $10.80."); [D.E. 164-10] 122 ("You will be paid a rate of $11.60 per load."); [D.E. 164-9] 80 ("Base Compensation 15.00 per load."). Butterball also told several plaintiffs that it would pay them piece-rate when they began working for Butterball. See, e.g., [D.E. 164-10] 13, 54–55; [D.E. 164-11] 23–24; [D.E. 164-34] 5. Jones told new hires that Butterball would pay them on a "strictly per load rate." [D.E. 164-2] 58, 60. Several opt-in plaintiffs knew Butterball paid them piece-rate. See, e.g., [D.E. 164-10] 87; [D.E. 164-22] 5 (plaintiff Peterson "was paid by load at [other] farms he worked at"); [D.E. 164-23] 7 ("Peterson was under the impression that [Butterball] would be paying him the same way he was paid" by other farms); [D.E. 164-31] 8 (plaintiff Raynor "was

paid a rate of approximately $12 to $16 per load, per his best recollection of his paystubs"). Moreover, Figueroa's paystubs show that Butterball paid him by "LoadTrip." See [D.E. 164-7] 238–343. These paystubs "reflect[] piece-rate compensation." Figueroa v. Butterball, LLC, No. 5:20-CV-585, 2021 WL 4203652, at *5 (E.D.N.C. Sept. 15, 2021) (unpublished) ("Figueroa I"); see id. at *9 ("[T]he paystub is not ambiguous. It provides for piece-rate compensation and overtime."). Thus, no rational jury could find that Butterball agreed to pay plaintiffs hourly.

In opposition to this conclusion, Figueroa argues: (1) Butterball's online job posting and handbook referred to plaintiffs' jobs as hourly; (2) Jones testified that the offer letters did not "smell right" and that he never used such offer letters; (3) plaintiffs' paystubs show an hourly rate of pay and hours worked, and plaintiffs did not understand the "LoadTrip" line on their paystubs; (4) Figueroa testified he did not receive an offer letter and did not recognize his signed offer letter from Butterball; and (5) Figueroa's purported signed offer letter contains errors demonstrating the letter was not intended for Figueroa. See [D.E. 167] 16–21; [D.E. 172] 12–16; [D.E. 186] 10–11.

As for Butterball's online job posting and handbook, Figueroa argues that plaintiffs understood that Butterball would pay them hourly because Butterball's job description and handbook described their job as "hourly." See [D.E. 167] 16–17. Butterball's on-line posting described its turkey catcher position as "Hourly" rather than "Salaried." [D.E. 88-7] 2; see also DRSMF ¶¶ 59–60. Butterball's employee handbook included turkey loaders and catchers as "hourly." See, e.g., [D.E. 164-3] 78–80. Figueroa, however, fails to forecast evidence that any plaintiff understood himself to be an hourly employee because of the job description or handbook. Indeed, Jones told new hires that Butterball would pay them a "strictly per load rate," not hourly as stated in the handbook. [D.E. 164-2] 58. Plaintiffs corroborated Jones's testimony. See, e.g., [D.E. 164-10] 13 ("The stuff that I was going over and the handbooks and stuff and the policies

11

was showing me hourly. Verbally he told me they don't go by that. They go by the load. Getting paid by the load."), 54–55 ("I was asking him about all the documents was saying hourly wages. And I asked him and that's when he verbally told me about per—getting paid per truckload."); [D.E. 164-34] 5 ("Lazo was told that he would be paid by the load . . . ."). Accordingly, Butterball's job posting and handbook fail to create a genuine issue of material fact concerning plaintiffs' compensation.

In opposition to this conclusion, Figueroa cites his own testimony and argues that "he applied to the job posting at Butterball indicating he would be an hourly employee because it would pay more than other companies." [D.E. 172] 14. Figueroa, however, testified that the job description he saw when he applied offered "between . . . [$]16 and $18 an hour." [D.E. 164-6] 113–14. The job description Figueroa now cites does not state a specific hourly rate. See id. at 116; [D.E. 88-7] 2. Figueroa concedes that the job posting he allegedly reviewed before he applied to Butterball "must have been something different." [D.E. 164-6] 116. Accordingly, Figueroa fails to forecast evidence that plaintiffs relied on Butterball's job posting to understand their compensation.

As for Jones's testimony, Figueroa contends that Jones's testimony contradicts Butterball's offer letters. According to Figueroa, Jones "testified that such purported offer letters did not smell right" and that Jones "never used such offer letters when offering loaders and catchers . . . employment." [D.E. 167] 17 (quotations and emphasis omitted); see also [D.E. 172] 13; [D.E. 186] 10 n.4.

Figueroa misrepresents Jones's testimony. Jones testified it would not "smell right" for Butterball HR to give a job applicant "an offer letter during an interview." [D.E. 164-2] 91 (emphasis added). Jones did not testify that the offer letters themselves did not "smell right." See

12

id.; see also [D.E. 164-15] 31, 97; [D.E. 164-10] 122; [D.E. 164-9] 80. Moreover, Jones did not testify "he never used . . . offer letters." [D.E. 167] 17. Rather, Jones testified he did not know exactly when Butterball HR would give offer letters to job applicants but that it would be after the interview. See [D.E. 164-2] 91–92.

Jones's testimony comports with Butterball HR employees' testimony about when they provided offer letters. Arthur testified that if an interview went well, she then would "call the employee to come to the office" where he would "sign the letter." [D.E. 164-3] 99. Arthur also would "ask [the employee] to bring some documentation with him for the I-9 form and then let him know that he would be scheduled for a drug test." Id. Thus, Arthur would not give an applicant an offer letter until after the applicant interviewed and Butterball decided to hire the applicant. See id. Accordingly, the court rejects Figueroa's argument that Jones's testimony contradicts Butterball's offer letters.

As for plaintiffs' paystubs, Figueroa argues that plaintiffs "naturally understood" that Butterball paid them hourly because their paystubs display an hourly rate of pay and hours worked during each pay period. [D.E. 167] 18; see also [D.E. 172] 14, 28; [D.E. 186] 11. In support, Figueroa cites Howerton's deposition[1] and argues that Howerton testified that plaintiffs' paystubs show an hourly rate of pay. See [D.E. 167] 18; PSMF ¶ 81; see also [D.E. 117-3] 46–47.

The court rejects Figueroa's argument. Plaintiffs' paystubs do not specify what "Rate" means. See, e.g., [D.E. 164-7] 238–343. Moreover, Howerton testified that Figueroa's paystub reflected an "hourly" rate based on her reading of "interrogatory responses by Butterball" about Figueroa's pay. [D.E. 117-3] 47. Butterball's interrogatory responses, however, did not specify

---

[1] Howerton was Butterball's Rule 30(b)(6) deponent. See [D.E. 117-3] 2; Fed. R. Civ. P. 30(b)(6).

Figueroa's "hourly rate." Instead, Butterball's responses disclosed "the rate of work performed by Plaintiff Osvaldo Figueroa under 29 C.F.R. § 778.111(a)." [D.E. 166-7] 5. That regulation defines how to calculate a "pieceworker's 'regular rate'" for a pay period. 29 C.F.R. § 778.111(a) (emphasis added). Thus, the "Rate" on plaintiffs' paystubs confirms plaintiffs' status as piece-rate employees. Compare [D.E. 166-7] 5, with [D.E. 164-7] 238–343. Furthermore, "[t]hat Figueroa tracked his hours . . . comports with piece-rate compensation and does not indicate an hourly pay structure." Figueroa I, 2021 WL 4203652, at *5; see, e.g., Alston v. DIRECTV, Inc., 254 F. Supp. 3d 765, 795 (D.S.C. 2017); Gaxiola, 776 F. Supp. 2d at 124. Thus, plaintiffs' paystubs "reflect[] piece-rate compensation." Figueroa I, 2021 WL 4203652, at *5.

Next, Figueroa argues that plaintiffs "did not know or understand" the meaning of "LoadTrip" on their paystubs. [D.E. 167] 18. "Mere confusion about pay structure" does not create an FLSA claim. Figueroa I, 2021 WL 4203652, at *5. "Neither the regulation nor the FLSA in any way indicates that an employee must also understand the manner in which his or her overtime pay is calculated." Bailey v. Cnty. of Georgetown, 94 F.3d 152, 156 (4th Cir. 1996); see Griffin, 142 F.3d at 717. Moreover, the FLSA does not "place[] the burden on the employer to hold an employee's hand and specifically tell him or her precisely how the payroll system works." Griffin, 142 F.3d at 717 (quotation omitted). Accordingly, the court rejects Figueroa's argument that plaintiffs' pay stubs do not reflect piece-rate compensation. See, e.g., id. at 716–17.

As for Figueroa's offer letter, Figueroa contends that Butterball's offer letter that he purportedly signed is "unverifiable" because Figueroa testified that he did not receive any offer letter or recognize the specific offer letter Butterball produced. [D.E. 167] 20 (emphasis omitted); see also [D.E. 172] 12–13. Figueroa testified that a translator read an offer letter to him, and he signed the offer letter that the translator read. See [D.E. 166-9] 15–16. Figueroa, however,

14

testified that the offer letter that Butterball produced was not the offer letter that he signed because the offer letter he signed "said 18 per hour, not 10.80 per hour." [D.E. 166-9] 18; see also [D.E. 164-15] 31.

Figueroa fails to forecast any corroborating evidence that he signed an offer letter that offered him $18.00 per hour. Cf. [D.E. 166-9] 18. Figueroa's self-serving testimony does not suffice to create a genuine issue of material fact concerning the contents of his alleged offer letter when compared to the signed offer letter in the record. See, e.g., Anderson, 477 U.S. at 249; Nat'l Enters., Inc. v. Barnes, 201 F.3d 331, 335 (4th Cir. 2000).

Figueroa also argues that the court should not credit the signed offer letter in the record because the letter refers to a "Jesus" and "bears a different date" than the rest of Figueroa's "signed onboarding paperwork." [D.E. 167] 20 (emphasis omitted); see also [D.E. 172] 12–13. Butterball's offer letter to Figueroa refers to a "Jesus" once, but it shows Figueroa's name throughout the rest of the letter. See [D.E. 164-15] 31–32. Butterball addressed the letter to Figueroa, and the signature line uses Figueroa's name. See id. Moreover, other plaintiffs signed and dated their offer letters days or weeks before they started work and received their other onboarding documents. Compare [D.E. 164-10] 122–23 (Webb's offer letter), and [D.E. 166-2] 3–4 (Raynor's offer letter), with [D.E. 166-3] 10, and [D.E. 166-4] 8 (Webb's onboarding documents), and [D.E. 166-3] 12, and [D.E. 166-4] 10 (Raynor's onboarding documents). This practice comports with Arthur's testimony that she gave successful applicants offer letters very soon after their interviews. See [D.E. 164-3] 99. Accordingly, the court rejects Figueroa's argument that Figueroa's signed offer letter, which specifies piece-rate pay, is unreliable.

There is no genuine issue of material fact about whether plaintiffs were piece-rate employees. They were.

15

**B.**

Under the FLSA, it is the employer's burden "to keep proper records of wages, hours, and other conditions and practices of employment," because the employer is in a better position than the employee to do so. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946), superseded on other grounds by statute, Portal-to-Portal Act of 1947, Pub. L. No. 80-49, 61 Stat. 84; see also 29 U.S.C. § 211(c). "[W]hen employers violate their statutory duty to keep proper records, . . . employees thereby have no way to establish the time spent doing uncompensated work . . . ." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 456 (2016). When an employer has failed to keep or maintain proper records, the court employs a burden-shifting framework that allows employees without access to accurate timekeeping records to rely on their own testimony to meet their burden of proof. See Mt. Clemens, 328 U.S. at 687–88; Castillo v. Joann Urquhart, M.D., P.C., 855 F. App'x 877, 880 (4th Cir. 2021) (per curiam) (unpublished); Reich v. S. Md. Hosp., Inc., 43 F.3d 949, 951 (4th Cir. 1995). The employer may then come forward with evidence of the precise amount of work performed or with evidence negating the inferences drawn from the employee's evidence. See Mt. Clemens, 328 U.S. at 687–88; Castillo, 855 F. App'x at 880.

To calculate plaintiffs' overtime wages, the parties have produced timekeeping and employment records that Butterball kept, including punch detail reports and paystubs. See, e.g., [D.E. 164-16]; [D.E. 166-6]. Butterball relies on its records and argues that its records are accurate. See [D.E. 162] 19–25. Figueroa responds that Butterball's records are inaccurate because: (1) Butterball's records of hours worked do not match the hours on plaintiffs' paystubs; (2) Butterball barred plaintiffs from recording hours they worked performing pre-shift activities; (3) Butterball compensated a plaintiff for eight hours of work if the plaintiff failed to clock out at the end of a shift; (4) Butterball deducted lunch breaks from plaintiffs' hours; and (5) Butterball's punch clock

16

sometimes did not work.  See [D.E. 167] 14–15; [D.E. 172] 11–12; [D.E. 186] 5–10.  Butterball

rejects as meritless "Figueroa's contentions" concerning Butterball's records.  [D.E. 176] 10; see

id. at 9–20; [D.E. 187] 9–10.

      As for purported discrepancies between different records, plaintiffs' workweek was

Sunday to Saturday.  See DSMF ¶ 126; PSMF ¶ 126.  Butterball used plaintiffs' hours worked

from Sundays to Saturdays to calculate plaintiffs' pay.  See [D.E. 164-16] ¶ 6.  Butterball's

paystubs, however, generally reflected hours worked from Mondays to Sundays.  See [D.E. 164-

7] 122–23.  Thus, Butterball's records reflect the same hours worked from Mondays to Saturdays

but include different Sunday shifts.  How Butterball's payroll system handled Sunday shifts

explains the discrepancy between plaintiffs' hours shown on their paystubs and the hours they

worked during the pay periods.

      For example, Figueroa cites one week in which his paystub reflected 70 hours and 32

minutes (70.53 hours) worked, but Butterball only paid him for 26.31 hours of overtime, i.e., 66.31

total hours worked.  See [D.E. 172] 10.  That paystub reflects hours worked from Monday, January

22, 2018, to Sunday, January 28, 2018.  See [D.E. 166-6] 39.  From Sunday, January 21, 2018, to

Sunday, January 28, 2018, Figueroa worked the following shifts:

      (1)  Sunday, January 21, 2018:  11 hours and 12 minutes.
      (2)  Monday, January 22, 2018:  11 hours and 32 minutes.
      (3)  Tuesday, January 23, 2018:  13 hours and 10 minutes.
      (4)  Wednesday, January 24, 2018:  11 hours and 28 minutes.
      (5)  Thursday, January 25, 2018:  11 hours and 13 minutes.
      (6)  Friday, January 26, 2018:  7 hours and 43 minutes.
      (7)  Sunday, January 28, 2018:  15 hours and 26 minutes.

See [D.E. 164-16] 18.  From January 21, 2018, to January 27, 2018, Figueroa worked 66 hours

and 18 minutes (66.3 hours).  See id.  From January 22, 2018, to January 28, 2018, Figueroa

worked 70 hours and 32 minutes (70.53 hours).  See id.  On February 2, 2018, Butterball paid

Case 5:20-cv-00585-D   Document 195   Filed 08/23/24   Page 17 of 24

Figueroa for his hours worked from January 21, 2018, to January 27, 2018. See [D.E. 166-6] 39; [D.E. 164-16] ¶ 6; [D.E. 164-7] 351. Butterball paid Figueroa for his January 28, 2018 shift in his next paystub. See [D.E. 164-7] 351. Thus, Figueroa fails to create a genuine issue of material fact about whether Butterball's records of plaintiffs' hours worked are "inaccurate or inadequate." Mt. Clemens, 328 U.S. at 687. Butterball's records are not.

Other evidence confirms this conclusion. Figueroa received 52 paystubs from Butterball in 2018. See [D.E. 166-6] 36–87. According to "AttendHr" on Figueroa's paystubs, Figueroa worked 2,440.1 hours in 2018. See id. According to Figueroa's punch detail report, Figueroa finished 2017 with 1,563 hours and 8 minutes (1,563.13 hours) worked and finished 2018 with 4,090 hours and 38 minutes (4,090.63 hours) worked. See [D.E. 164-16] 17–22. After subtracting holidays, Figueroa worked 2,459.5 hours. See id.; see also [D.E. 164-7] 350–58. Figueroa's tracked hours in his paystubs and punch detail report are almost identical over the relevant time periods. Thus, Figueroa's cited discrepancies fail to create a genuine issue of material fact about the accuracy of Butterball's records. See Mt. Clemens, 328 U.S. at 687–88.

Figueroa argues that the court cannot rely on the punch detail reports because Butterball made plaintiffs perform pre-shift activities before clocking in. [D.E. 167] 14–15; see [D.E. 186] 7–8. Figueroa cites Mt. Clemens and argues that "time clock records are not controlling" where "the employee is required to be on the premises or on duty at a different time or where the payroll records or other facts indicate that work starts at an earlier or later period." [D.E. 186] 6 (quotation omitted); see Mt. Clemens, 328 U.S. at 690.

In the Portal to Portal Act of 1947, Congress absolved employers of FLSA liability if the employer failed to pay employees overtime for "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to

18

perform, and . . . activities which are preliminary to or postliminary to said principal activity or activities, which occur . . . prior to the time on any particular workday at which such employee commences . . . such principal activity or activities." 29 U.S.C. § 254(a); see Integrity Staffing Sols., Inc. v. Busk, 574 U.S. 27, 31–33 (2014) (describing how section 254 abrogates Mt. Clemens). Three opt-in plaintiffs testified that Butterball occasionally had plaintiffs clean the vans that took them to turkey farms or fill up the vans with gasoline before the plaintiffs clocked in. See [D.E. 158-1] 9–10; [D.E. 166-10] 16–17; [D.E. 166-12] ¶¶ 5–6; cf. IBP, Inc. v. Alvarez, 546 U.S. 21, 42 (2005). The court, however, rejects Figueroa's argument that the alleged sporadic pre-shift activities render Butterball's records of plaintiffs' working hours "inaccurate or inadequate." Mt. Clemens, 328 U.S. at 687; cf. Marroquin v. Canales, 505 F. Supp. 2d 283, 298 (D. Md. 2007) (employing the Mt. Clemens burden-shifting framework where defendants did "not provide[] any records or evidence" (emphasis added)).

Next, Figueroa argues that if plaintiffs forgot to clock out at the end of a shift, Butterball "only compensated Plaintiffs for eight . . . hours of work" regardless of how long plaintiffs' shifts were. [D.E. 167] 15. Figueroa, however, only cites Batchelor's testimony in support of this contention. See PSMF ¶ 44. Batchelor testified that if turkey catchers and loaders forget to clock out, he "think[s] they get paid for 8 hours" instead of their actual hours worked. [D.E. 88-4] 34. Batchelor based his testimony on what someone "told [him] up in the office," but he could not remember who told him. Id. at 35. The court does not credit Batchelor's hearsay testimony. See Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 401, 602, 802. Moreover, Figueroa forecasts no evidence to dispute that plaintiffs' "time entries were rarely, if ever, entered such that a shift resulted in exactly eight hours of time credit." DRSMF ¶ 112; see Pl.'s Reply Statement of Material Facts

19

[D.E. 184] ¶ 112. Accordingly, the court rejects Figueroa's argument that Butterball's records are "inaccurate or inadequate." Mt. Clemens, 328 U.S. at 687.

Figueroa also argues that Butterball's records are unreliable because Butterball "automatically deducted" 30-minute lunch breaks from plaintiffs' hours even though Butterball did "not giv[e] Plaintiffs a full thirty (30) minute lunch break." [D.E. 167] 15. In support, Figueroa only cites Peterson's declaration. See PSMF ¶ 87.[2] Peterson declared that he "believe[s] that although [he] was often unable to take a lunch break, Butterball was automatically deducting full thirty (30) minutes each shift for a lunch period." [D.E. 166-12] ¶ 26. Peterson believed this because "the hours noted on [his] paystubs were not consistent with the hours [he] recall[ed] working." Id. As discussed, how Butterball's payroll system handled Sunday shifts explains the discrepancy between plaintiffs' hours shown on their paystubs and the hours they worked during pay periods. Thus, the court does not credit Peterson's declaration. See Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602. Moreover, Sanderson declared that Butterball does not reduce recorded hours for turkey catchers and loaders based on lunch or other breaks. See [D.E. 164-16] ¶¶ 9–12. Accordingly, Figueroa fails to create a genuine issue of material fact about whether Butterball's timekeeping and employment records are "inaccurate or inadequate." Mt. Clemens, 328 U.S. at 687–88.

As for Butterball's punch clock, Figueroa argues that the clock "did not always accurately record clock-in times." [D.E. 167] 15. Some plaintiffs testified that Butterball's punch clock occasionally malfunctioned. See [D.E. 158-1] 18; [D.E. 166-10] 19, 21; [D.E. 166-11] 11. Those

---

[2] Elsewhere, Figueroa cites other plaintiffs' depositions and argues that plaintiffs did not receive a "full uninterrupted thirty (30) minute lunch break." PSMF ¶ 55. Although those plaintiffs complained of short or interrupted lunch breaks, those plaintiffs did not testify about whether Butterball deducted lunch breaks from their hours. See id.

Case 5:20-cv-00585-D   Document 195   Filed 08/23/24   Page 20 of 24

plaintiffs, however, also testified that when Butterball's punch clock malfunctioned, they would "[p]unch it again. . . . till it" worked, [D.E. 166-11] 11, or tell their supervisor. See [D.E. 158-1] 18; [D.E. 166-10] 19, 21. The supervisor would then manually record the hours. See [D.E. 158-1] 18; [D.E. 166-10] 19, 21. Figueroa fails to create a genuine issue of material fact about whether Butterball's timekeeping and employment records are "inaccurate or inadequate." Mt. Clemens, 328 U.S. at 687–88. Thus, the court credits Butterball's records and uses them to calculate plaintiffs' overtime wages.

## C.

As for plaintiffs' overtime wages, the FLSA requires a covered employer to pay a covered employee one and one-half times the employee's regular rate for all hours worked in excess of 40 hours per week. See 29 U.S.C. § 207(a); Roy, 141 F.3d at 538; Turner, 268 F. Supp. 3d at 836. A court must convert piece-rate earnings to an hourly rate to determine whether the earnings comply with overtime pay requirements. See 29 C.F.R. § 778.111(a); see also Turner, 268 F. Supp. 3d at 836 ("A non-exempt employee's 'regular rate' of pay provides the basis for calculation of his overtime rate."). The FLSA regulations state:

> When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions). This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's "regular rate" for that week. For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week.

29 C.F.R. § 778.111(a); see Turner, 268 F. Supp. 3d at 836–37; Alston, 254 F. Supp. 3d at 792; see also 29 U.S.C. § 207(g); Pest v. Bridal Works of N.Y., Inc., 268 F. Supp. 3d 413, 427–30 (E.D.N.Y. 2017). The FLSA regulations illustrate how to apply this compensation method:

21

[F]or example, if the employee has worked 50 hours and has earned $491 at piece rates for 46 hours of productive work and in addition has been compensated at $8.00 an hour for 4 hours of waiting time, the total compensation, $523.00, must be divided by the total hours of work, 50, to arrive at the regular hourly rate of pay— $10.46. For the 10 hours of overtime the employee is entitled to additional compensation of $52.30 (10 hours at $5.23). For the week's work the employee is thus entitled to a total of $575.30 (which is equivalent to 40 hours at $10.46 plus 10 overtime hours at $15.69).

29 C.F.R. § 778.111(a).

Figueroa does not forecast evidence to dispute that Butterball properly calculated plaintiffs' overtime compensation under the piece-rate regulations. Compare DSMF ¶¶ 195–99, with PRSMF ¶¶ 195–99. Instead, Figueroa repeats his arguments that Butterball did not clearly explain to plaintiffs that they were piece-rate employees and that Butterball's records are inaccurate and unreliable. See PRSMF ¶¶ 195–99; [D.E. 172] 16–19. As discussed, Figueroa fails to create a genuine issue of material fact concerning the method of plaintiffs' pay or the accuracy of Butterball's records. Even viewing the record in the light most favorable to plaintiffs, no reasonable jury could find that Butterball improperly calculated plaintiffs' overtime compensation as piece-rate employees.

For example, on Figueroa's paystub from Monday, November 27, 2017, to Sunday, December 3, 2017, Figueroa received $951.89 in gross pay. See [D.E. 166-6] 31. From Sunday, November 26, 2017, to Saturday, December 2, 2017, Figueroa worked 46.66 hours. See [D.E. 164-16] 17.[3] Figueroa earned $888.48 in "LoadTrip," or piece-rate, pay. See [D.E. 166-6] 31. Divided by 46.66 hours worked, Figueroa earned a regular rate of $19.04 per hour. Figueroa also earned $63.41 in overtime. See id. Divided by the hours of overtime worked (6.66), Figueroa

---

[3] As Butterball explains, the "Hours" field in the punch detail history tables is an hours and minutes figure for older reports, not an hour and hundredths of an hour figure. See [D.E. 176] 12–13. Accordingly, for the purpose of these overtime premium calculations, the figures in the punch detail history table are converted to hour and hundredths of an hour figures.

22

earned an hourly overtime premium of $9.52. Cf. 29 C.F.R. § 778.111. That overtime premium equals what the regulations require. See id.

On Figueroa's paystub from Monday, January 15, 2018, to Sunday, January 21, 2018, Figueroa received $1,382.15 in gross pay. See [D.E. 166-6] 38. From Sunday, January 14, 2018, to Friday, January 19, 2018, Figueroa worked 67.65 hours. See [D.E. 164-16] 18. Figueroa earned $1,147.62 in LoadTrip pay. See [D.E. 166-6] 38. Divided by 67.65 hours worked, Figueroa earned a regular rate of $16.96 per hour. Figueroa also earned $234.53 in overtime. See id. Divided by the hours of overtime worked (27.65), Figueroa earned an hourly overtime premium of $8.48. Cf. 29 C.F.R. § 778.111. That overtime premium equals what the regulations require. See id.

On Webb's paystub from Monday, October 19, 2020, to Sunday, October 25, 2020, Webb received $1,121.69 in gross pay. See [D.E. 166-6] 235. From Sunday, October 18, 2020, to Friday, October 23, 2020, Webb worked 55.2 hours. See [D.E. 164-16] 27. Webb earned $986.00 in LoadTrip pay. See [D.E. 166-6] 235. Divided by 55.2 hours worked, Webb earned a regular rate of $17.86 per hour. Webb also earned $135.69 in overtime. See id. Divided by the hours of overtime worked (15.2), Webb earned an overtime premium of $8.93. Cf. 29 C.F.R. § 778.111. That overtime premium equals what the regulations require. See id. Accordingly, there is no genuine issue of material fact that Butterball properly calculated and paid plaintiffs' overtime. Thus, the court grants Butterball summary judgment on plaintiffs' FLSA claims and denies Figueroa's motion for summary judgment. See, e.g., Alston, 254 F. Supp. 3d at 795.

## IV.

On February 15, 2024, Figueroa moved for equitable tolling. See [D.E. 174]. The court grants Butterball summary judgment on plaintiffs' FLSA claims. Accordingly, the court denies as moot Figueroa's motion to equitably toll FLSA's statute of limitations. See, e.g., Akers v. Tim

23

_Jungblut Trucking, Inc._, No. 1:18-CV-3316, 2020 WL 1447647, at *4 (S.D. Ind. Mar. 25, 2020) (unpublished).

On March 27, 2024, Butterball moved to strike Figueroa's summary of unpaid wages. See [D.E. 189]; see also [D.E. 185] (summary of unpaid wages). Figueroa concedes that his summary of unpaid wages "may only become relevant to the extent the Court grants [Figueroa's] motion for summary judgment; otherwise, the Court may simply dispose of this information altogether." [D.E. 192] 2 n.3. The court grants Butterball's motion for summary judgment and denies Figueroa's motion for summary judgment. Accordingly, the court denies as moot Butterball's motion to strike.

V.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 161], DENIES plaintiff's motion for summary judgment [D.E. 165], DENIES AS MOOT plaintiff's motion for equitable tolling [D.E. 174], DENIES AS MOOT defendant's motion to strike [D.E. 189], GRANTS plaintiff's motion to dismiss the claims of opt-in plaintiff Adams [D.E. 191], and DISMISSES WITH PREJUDICE opt-in plaintiff Adams's claims. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This _23_ day of August, 2024.

_JAMES C. DEVER III_
United States District Judge

24
